## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

LOU ANN JOHNSON,

Plaintiff,

vs.

ELIOR, INC. d/b/a ELIOR NORTH
AMERICA,

Defendant.

**COMPLAINT**
Civil Action No.: 3:22-cv-210

Plaintiff Lou Ann Johnson ("Plaintiff" or "Ms. Johnson"), by and through her undersigned

counsel, complaining of defendant Elior, Inc. ("Defendant" or "Elior") alleges and says as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action against Defendant for violations of the Age

Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), the Equal Pay Act, 29

U.S.C. § 206(d) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000E ("Title

VII").

2.      Defendant hired Plaintiff on or around July 9, 2018 as a Procurement Manager.

Despite her background and greater procurement experience, Defendant failed to pay her equal

pay for equal work because of her gender.  Upon information and belief, Plaintiff's salary was

significantly lower than that of her male counterparts, including male counterparts under the age

of 40.

3. Because Plaintiff complained about the unequal pay and hiring practices that favored men under the age of 40 over her, Defendant terminated her employment on or about October 6, 2020 and replaced her with another male under the age of 40.

4. Defendant's discrimination and retaliation have caused Plaintiff substantial economic and non-economic damages.

## JURISDICTION

5. This Court has jurisdiction over this action pursuant to 28. U.S.C. § 1331 in that this is a civil action arising under the EPA, Title VII, and the ADEA. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

## VENUE

6. Venue is proper in this district under 42 U.S.C. §2000e-5(f)(3), in that the unlawful employment practice was committed in Mecklenburg County, North Carolina, and Defendant's principal office is in this district.

## CONDITIONS PRECEDENT

7. On or around April 12, 2021, Plaintiff timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

8. On February 11, 2022, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of Plaintiff's receipt of that notice.

9. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under applicable law.

## PARTIES

10. Plaintiff is a woman over the age of 40 who is a North Carolina citizen and resides in Charlotte, North Carolina.

11.     Plaintiff is an "employee" as defined by the EPA, Title VII, and the ADEA.

12.     Upon information and belief, Defendant is a Delaware corporation with its headquarters in Charlotte, Mecklenburg County, North Carolina.

13.     Defendant is an "employer" as defined by the EPA, Title VII, and the ADEA.

## FACTS

14.     Defendant initially reached out to Plaintiff in early 2018 to see if she would be interested in leaving her then employer, Sealed Air Corporation ("Sealed Air"), and coming to work for Defendant in its procurement department.

15.     On or about June 5, 2018, after multiple interviews, Defendant extended Plaintiff a job offer to join Elior as a Procurement Manager.

16.     Because Defendant's salary offer was only around $1,000 more than she was making at her present employer, and Elior's benefits package was less than what she had at Sealed Air, Plaintiff attempted to negotiate an increase in her proposed salary.  However, Defendant initially denied her request.

17.     Because of her extensive procurement experience, Professional Supply Management certifications ("CPSM"), and Master of Business Administration ("MBA") which she had completed in 2008,  Plaintiff next asked if she could be brought on as a Senior Procurement Manager, assuming that this would make her eligible for a higher pay level.

18.     Although Defendant also denied this request, it subsequently increased its offer to Plaintiff, promised her a guaranteed one-time bonus (in addition to other bonuses for which she might qualify), and assured her that it was working to upgrade its benefits package.

19.     Because Plaintiff was looking for a new challenge and saw the position with Elior as an opportunity to build a department, she ultimately decided to accept Defendant's offer.

20. Plaintiff started work at Elior on or about July 9, 2018, the same date as another new employee, Nick DeRose ("DeRose"). At that time, Plaintiff was also told that Elior had hired two new analysts for the Procurement Department.

21. After joining Elior, Plaintiff was assigned to manage proteins/center of plate and frozen items as well as support concept development with Elior's Corporate Culinary. Her duties in this role included developing new concepts, sourcing items for the segment, developing a supply chain, working on pricing and rebates, and coordinating samples.

22. Although Plaintiff understood that she and DeRose had both been brought on as Procurement Managers, she subsequently learned that DeRose, a white male under the age of 40, had, in fact, been hired as a Senior Procurement Manager at, upon information and belief, a higher rate of pay, although he was doing the same work as Plaintiff.

23. Because Plaintiff had significantly more procurement experience than DeRose and had completed her MBA a decade before joining Elior (whereas, upon information and belief, DeRose had just completed his MBA before starting with Defendant), Plaintiff asked her then supervisor, Dele Oladegi ("Oladegi"), Elior's VP of Procurement, why DeRose had been hired as a Senior Procurement Manager and she had not. Rather than giving her a reason, however, Oladegi told Plaintiff only that he would "get back to [her] on that."

24. In December 2018, after Oladegi informed Plaintiff about the amount of her bonus, Plaintiff asked when her performance review would be scheduled. Oladegi claimed that he and Elior's then CFO, Robb Schrek ("Schreck") were still finalizing information for the reviews. Because Plaintiff was running late to an out-of-office event, she did not then bring up that Oladegi had yet to answer her question about why DeRose was hired as a Senior Procurement Manager and she was not.

25.     On or around January 28, 2019, Plaintiff again asked Oladegi when her performance review would be.  In response, Oladegi said that he would not be doing a formal review for her but, instead, would just be giving her feedback throughout the year.  When Plaintiff then reminded Oladegi that he had not responded to her inquiry about DeRose, Oladegi replied that he would talk to HR and, again, "get back to [her]."

26.     In or around March 2019, Elior announced that, going forward, employees who were bonus eligible had to have two assigned performance goals to work towards for bonus eligibility.  Thereafter, Oladegi scheduled a one-on-one meeting with Plaintiff to discuss her performance goals.

27.     At that meeting, without Plaintiff bringing it up, Oladegi told Plaintiff that neither her title nor her salary were going to be changed to the Senior Procurement Manager level like DeRose.  Instead, he stated that he, Schrek, and Pat Ahern ("Ahern"), Elior's VP of Human Resources, "had everyone calibrated where they wanted them" and were not making changes.

28.     Oddly, Oladegi then asserted that all of his direct reports (except for the Director of Procurement) were of "equal status" regardless of title.  Oladegi appeared to make this claim in an attempt to convince Plaintiff that she and DeRose – who, again, was less than 40 years of age and had less procurement experience than Plaintiff – were equals, even though he had the title of Senior Procurement Manager and, upon information and belief, was receiving a higher rate of pay.

29.     When Plaintiff pointed this out to Oladegi, he responded that he had made a concession in giving DeRose the "Senior Procurement Manager" designation to recruit him to join Elior – something he had refused to do for Plaintiff.

30.     When Plaintiff pointed out that this, at a minimum, appeared to be a "male versus female issue," Oladegi condescendingly replied, "Oh Lou Ann, don't go there." He then quickly changed the subject to talk about her performance goals.

31.     Oladegi unilaterally set two goals for Plaintiff to be eligible for a bonus: i) a cost savings target, and ii) to vet opportunities to buy "seconds" from suppliers for Elior's senior living/senior nutrition segment.

32.     In response, Plaintiff told Oladegi that while the first goal made sense, the second goal did not for a number of reasons: first, it was not a measurable goal – there were no numbers or milestones given to Plaintiff to objectively indicate if the goal had been achieved; second, Plaintiff had no experience in the senior living/senior nutrition segment and no familiarity with senior menus or suppliers for that segment; third, by assigning Plaintiff this goal, Oladegi was tasking her to be a transactional buyer rather than a Procurement Manager; and fourth, in light of the other duties that Oladegi had already assigned her, achieving this subjective goal did not appear feasible from the outset.

33.     As noted above, Plaintiff was already responsible for managing her proteins/center of the plate and frozen items segment as well as providing support for Elior's Corporate Culinary segment. Plaintiff's newly assigned responsibilities for the senior living/senior nutrition segment – on which her bonus eligibility was now based – were thus in addition to those extensive duties.

34.     On top of that, Oladegi also charged Plaintiff with researching and coordinating a change in Elior's chicken supplier.

35.     Oladegi dismissed Plaintiff's concerns and unilaterally submitted the cost savings and vetting purchase opportunities for the senior segment as her goals for bonus eligibility. Unsurprisingly, she was subsequently deemed to have not achieved the second goal.

36.     Upon information and belief, Oladegi purposefully set Plaintiff up to fail by assigning her the unmeasurable "vetting opportunities" goal for the senior segment in retaliation for her complaints about her unequal treatment compared to DeRose. He then ensured she would not meet this goal by assigning her additional duties later.

37.     In the spring of 2019, Plaintiff was assigned a data analyst to work with who was new to Elior and, frankly, was not up to the job. The analyst's mistakes and inattention to detail required Plaintiff to not only check and correct the analyst's work but, in many cases, completely redo it.

38.     Although Plaintiff had multiple conversations with the analyst and her direct supervisor about problems with the analyst's work and reported the same to Oladegi, nothing was done to replace the analyst or provide Plaintiff with other support. As a result, Plaintiff was *de facto* forced to take on the analyst's duties in addition to her own.

39.     On or around July 25, 2019, Oladegi called Plaintiff in for a one-on-one meeting. He started the meeting by asking Plaintiff if she had completed yet another assignment he had given her to complete an RFP for a bacon supplier. Plaintiff replied that she had not because she had been directed to send all of the files for that project to consultants who had been hired by Defendant.

40.     Plaintiff then reminded Oladegi that she was also doing her main protein/center of plate segment, overseeing Elior's change in chicken suppliers, supporting Corporate Culinary concept development as outlined above, and meeting with suppliers to find additional purchasing income because of a budgeting shortfall in the department, and that she was doing all of this without analyst support.

41.     When Oladegi asked about the analyst, Plaintiff reminded him that, despite her timely complaints and requests for help, Oladegi had allowed the analyst to stay past the 90-day probationary period without action from Elior.

42.     Plaintiff then told Oladegi that she felt like he had set her up for failure on her bonus when he ignored her stated concerns in choosing her eligibility goals. In response, Oladegi just shrugged his shoulders and smugly told Plaintiff that she could work on goals to qualify for a bonus "next year."

43.     In or around August 2019, Defendant hired Scott Berkman ("Berkman") as Chief Procurement Officer. Thereafter, Plaintiff was told that Consultants had determined that the Procurement Department was understaffed, that new team members were going to be hired, and that the department would be reorganized. In the interim, Plaintiff was told to keep doing what she was doing.

44.     Oladegi left Elior in late August 2019. Another Procurement Manager, Angela Cook ("Cook"), then left Defendant without notice on or about October 10, 2019. Because Cook had not addressed time-sensitive pricing issues that she had been assigned prior to her departure, Plaintiff, in addition to her other duties, inherited that responsibility and immediately had to work out pricing issues with multiple suppliers before they expired on October 31, 2019.

45.     At a staff meeting on or about October 24, 2019, Berkman commended Plaintiff for working to complete the unfinished matters left by Cook, and for taking on other additional work in the canned and dry food category.

46.     At the end of the meeting, Berkman announced that Defendant would be bringing a new VP of Procurement on board the next week, and he showed a slide of a proposed organization chart for Elior going forward.

47.    Notably, the slide showed that every male who had been hired at or around the same time as Plaintiff was being promoted to a higher position, but that Ms. Johnson was not.  Instead, Plaintiff was being kept at her then current level of Procurement Manager but with yet another change in categories, this time to snacks/vending/beverages – an area in which Plaintiff had no prior experience.  The chart also showed that another woman, Brenda Hartl ("Hartl") was being demoted from a Director to a Senior Manager on the compliance side.

48.    Because no one had talked with Plaintiff about changing categories, she expressed both her surprise to Berkman about the change and her concern that all of her male contemporaries were getting promotions, but she was not.  This, in addition to DeRose being hired at a higher level than she was, led her to comment that it appeared that Elior had a problem with female employees.

49.    Berkman acknowledged Plaintiff's comment and remarked that he was having to clean up a lot of "messes" created by his predecessor.  Berkman then told Plaintiff not to worry about the chart, that there were other category management roles open, and he asked her to send him an email about areas she was interested in managing.

50.    Plaintiff subsequently talked with Berkman about the previous bonus goals that Oladegi had unilaterally set for her that appeared intended for her to fail.  She then stated that, in light of Oladegi's actions and the additional work she had taken on, she thought that Defendant should pay her the full amount of the bonus that she would otherwise have qualified for.  In response, Berkman asked Plaintiff to send him a written explanation as to why the second, unmeasurable performance goal set for her by Oladegi had not been achieved and that he would discuss her situation in light of the extenuating circumstances.

51.    Plaintiff subsequently sent Berkman a writeup addressing that situation, and, while admitting that she was still gaining experience in the area, Plaintiff told Berkman that she was

interested in continuing to manage proteins/center of plate items, frozen items, and/or some canned and dry items depending on the item.

52. In or about early November 2019, Robert Chinsky ("Chinsky") joined Elior as the new VP of Procurement. Chinsky subsequently told Plaintiff that Berkman had shared with him her interest in managing proteins/center of plate items, and that he would support her and commit to her development in managing that area.

53. On or about December 6, 2019, Berkman and Chinsky met with Plaintiff for what she understood to be a *de facto* review and verbal feedback. At that time, Berkman said that he would not comment on her statements about things that happened before he arrived, but instead he wanted to talk about the upcoming year.

54. As part of his comments, Berkman told Plaintiff that she was going to be promoted to the level of Senior Procurement Manager effective January 1, 2020 and what her new salary would be. When Plaintiff asked how her salary had been determined, Berkman said only that he had had to move some money around in the budget.

55. At the end of the meeting, Berkman also told Plaintiff the amount of the bonus she was being paid for the previous year, but without a breakdown. When Plaintiff asked if the bonus payment was based on her meeting both performance goals, Berkman admitted that he did not know and would have to get back with her.

56. Around that same time, Elior hired a new employee, Blake Kurlman ("Kurlman") to manage snacks/vending/beverages – the same job for which Plaintiff had previously been slated on the proposed organization chart.

57. Although the job had been posted as a "Procurement Manager" role – consistent with the title that Plaintiff held when the job was slated for her – Plaintiff subsequently learned

that Kurlman, a white male who, upon information and belief, was then not 30 years old, was being brought on as a "Senior Category Manager" for the role instead of as a Procurement Manager.

58.     Despite Plaintiff's questions, no one at Elior would explain to her what difference there was, if any, between a Procurement Manager and a Senior Category Manager in terms of responsibility and compensation.  Upon information and belief, Defendant hired Kurlman to do the same job it had previously slated for Plaintiff at a higher rate of compensation than it was paying Plaintiff.

59.     Plaintiff subsequently asked Berkman if he had heard back about her proposed bonus, but he said he had not.

60.     On or about December 20, 2019, Chinsky then called Plaintiff into his office and told her that Elior was willing to pay her a one-time bonus of $1,400 towards the second performance goal that Oladegi had set for her but would not pay her the full $3,493.13 that she would have been due had she been deemed to have met the goal in full.

61.     Plaintiff then explained to Chinsky why she believed she was entitled to the full bonus and recapped her experiences at Elior to date where it appeared that the company preferred males over females.  Chinsky then told Plaintiff that if the $1,400 was not acceptable to her, she should take the issue up with HR, although he warned her that HR was there "to protect the company."  Nevertheless, Plaintiff went to HR over the bonus issue and Defendant's hiring practices.

62.     In or about February 2020, before she heard back from HR about the bonus and investigation of apparent gender discrimination, Chinsky told Plaintiff that he had met with HR and given them his information on the issue.  Chinsky then told Plaintiff that no matter the outcome

of HR's review of the situation, she just "need[ed] to be okay with it," and that he was allegedly "committed to [her] development."

63.     In or around March 2020, Elior HR informed Plaintiff that she would not be paid the full amount of her bonus for the second performance goal set for her by Oladegi and denied that discrimination or retaliation had anything to do with that particular goal being set for her in addition to her other duties.     HR also denied that there had been any discrimination in DeRose being hired at a higher level than Plaintiff.

64.     During the first six months of Plaintiff's work in her new role, she performed her job well.  In later June 2020, however, Chinsky for the first time talked with Plaintiff about some issues that he saw and recommendations that he had concerning her performance.  Chinsky then followed this up with an email summary of those alleged items for Plaintiff to review.

65.     On or about July 2, 2020, Plaintiff responded to Chinsky noting at the outset that she was initially surprised by his comments because he had not previously shared any concerns about her work.  She then replied to his summary in detail to make sure they were on the same page going forward, and she asked for a time they could meet to discuss any remaining open questions.

66.     On July 3, Chinsky emailed Plaintiff stating that her response had given him a better understanding of her thoughts and perspective, and that he would like to address some questions that she had raised concerning her development.  Chinsky then asked Plaintiff to put together a plan with resources she needed for her development for discussion, and he asked her to strongly consider online or remote training as part of this.

67.     Thereafter, in response to Chinsky's request, Plaintiff put together an agenda for their meeting with a list of proposed on-line trainings for her development, and a meeting was set for July 17, 2020 to discuss the plan.

68.     Despite Plaintiff providing Chinsky with an agenda in advance, when they met Chinsky asked Plaintiff what they needed to discuss.  When Plaintiff replied that, as referenced on the agenda, she wanted to talk about the development plan he had asked her to put together, Chinsky almost irrationally responded that he was "not going to debate it" and that he expected Plaintiff "would not receive it well based on what [he knew] about her personality."

69.     Confused by Chinsky's statement, Plaintiff replied that she was not interested in a debate either.  Instead, she had hoped they were going to talk about her plan and the list of proposed trainings that she had prepared.

70.     Chinsky subsequently calmed down, and they proceeded to go through Plaintiff's plan and the list of proposed trainings.  Although Chinsky noted that Plaintiff had listed some good choices, he authorized her to take only one free course that she had identified and another course that cost $49.00 – the two cheapest classes on her list.

71.     Plaintiff next showed Chinsky her responses to the summary of issues and recommendations that he had outlined, and she stated that after her experience with Oladegi and the bonus issue, she wanted to be aligned with Chinsky on what she needed to be doing to make sure her performance improvement goals that had been met.

72.     In response, Chinsky stated that he had no performance checklist that he would complete for her regarding her goals.  Instead, he stated that he would be a reasonable judge of her performance and how she presented data.  Chinsky then proceeded to praise an earlier summary that Plaintiff had prepared on fish and seafood, noted that her work and communications since he

sent his earlier email summary showed that she was "getting the message," and he assured her that she was "not at risk of losing [her] job."

73.     Chinsky then said that it was clear that Elior had not treated Plaintiff as fairly as it should have previously, and he told Plaintiff that Defendant was going to hire another analyst to help her, and that it was clear that she and Procurement needed additional support.

74.     Chinsky concluded the meeting by saying that he would give Plaintiff weekly feedback going forward, praised what he saw as her improvement, and again noted that he believed she was "getting the message" without saying what the message was.

75.     Thereafter, Plaintiff and Chinsky had regular one-on-one meetings over the next six weeks during which time Chinsky made no mention about issues or problems with Plaintiff's work performance.

76.     As an example, in their 30-day "check-in" on July 27, Chinsky first commented that Plaintiff had been "very professional and direct" in handling a delicate discussion with Tyson Foods about Tyson's account manager's performance.

77.     In that same meeting, Chinsky also commended Plaintiff for being solution-focused with market-focused recommendations, noted that her reexamination and financial analysis of Defendant's seafood procurement had been particularly well done, and praised her for taking action to improve her education in the protein category.

78.     Chinsky concluded the meeting by stating that Plaintiff had shown "marked improvement," and that he was pleased with her effort and had nothing negative to say.

79.     Plaintiff was supposed to have a 60-day review with Chinsky, but it was not scheduled because Chinsky was out of the office.

80.     At Plaintiff's subsequent one-on-one meeting with Chinsky on September 1, 2020, however, Chinsky's interaction with and treatment of Plaintiff changed.  Unexpectedly, Chinsky claimed that Plaintiff was not where he thought Plaintiff should be on "CVP chicken, ground beef, hotdogs/dinner sausage, and deli meats."

81.     Plaintiff responded by detailing everything that she was doing on those categories as well as the added work of supporting Defendant's "Farm to Table" bid, pulling data for quarterly business reviews, finalizing a contract amendment with Tyson, and dealing with notifications that two suppliers were discontinuing certain stock keeping units ("skus").

82.     When Chinsky then asked if Defendant could do something different to help her, Plaintiff pointed out that she still did not have an analyst and, as a result, she was still having to perform a lot of basic, time-consuming tasks that would otherwise fall within an analyst's purview.

83.     Because they ran out of time before Plaintiff had gone over everything that she thought needed to be addressed, Plaintiff asked for another one-on-one meeting on September 3, 2020 to finish their discussion and ask about her 60-day review.

84.     On September 3, Chinsky sent Ms. Johnson a message asking what topics she wanted to discuss because he was not feeling well and might want to delay.  After Ms. Johnson sent him the topics, Chinsky first said they would meet at 9:15 a.m., but then asked Ms. Johnson to reschedule the meeting for September 4.

85.     Shortly after he arrived at Elior in November 2019, Chinsky had asked Plaintiff and his other reports to make scheduled meetings on their calendars visible to him on Microsoft Outlook, and that he would make his scheduled meetings visible to them as well, which he did. As a result, when Ms. Johnson went to reschedule their meeting for September 4, 2020, she saw that Chinsky had a call scheduled with Elior HR.

86.     At their September 4 meeting, Chinsky again claimed that Ms. Johnson was not where he thought she should be on her performance, added that they were "not on the same page" as to what an analyst does, and purported that the duties Plaintiff had earlier referenced were not tasks performed by an analyst.

87.     In that meeting, Chinsky also claimed that Ms. Johnson was being too detailed in her work despite earlier telling her that she was not detailed enough.  However, Chinsky then conceded, based on feedback from HR, that Plaintiff's work should be viewed in the context of being put into a role in which she still did not have a lot of experience, and he told Plaintiff that she should be given more time to develop – especially considering that Elior was asking its people to do more with less.  Chinsky also said that the Company had extended an offer to another analyst, and he told Plaintiff that he would see about having an analyst currently working at Elior reassigned to support her.

88.     At that point, Plaintiff told Chinsky that she had completed the two on-line courses he had assigned, and she asked if she could attend the online Urner Barry Conference – a conference for the protein industry – in October.

89.     Also, because Plaintiff wanted to make sure her project was completed by the end of the fiscal year on September 30, she asked Chinsky if she could carry over six accrued but unused vacation days from that fiscal year to October so that she would not lose them while she finished her project.  Chinsky replied that he had no problem with her taking the vacation days in October and that he would ask Berkman about her attending the Barry Conference in October.

90.     At their subsequent one-on-one meeting on September 10, 2020, Plaintiff again reviewed with Chinsky the matters she was working on.  Based on the progress that Plaintiff had made, Chinsky told her that she could stop work on the ground beef project because it was clear

that their current price was cheaper. Chinsky also told Ms. Johnson that she could attend the Barry conference and again confirmed that she could take her accrued but unused vacation days in October. Notably, in that meeting Chinsky raised no concerns about Ms. Johnson's performance as he had previously.

91.     Later in the day on September 10, Plaintiff went on Microsoft Outlook to look for a date to schedule a subsequent meeting with Chinsky to discuss an issue with excess chicken inventory. At that time, Plaintiff learned from Chinsky's calendar that Elior was apparently planning to summarily terminate her employment and replace her by October 5, 2020.

92.     Thereafter, Elior in fact terminated Plaintiff's employment with Elior on or about October 6, 2020. Further evidencing what appears to be a pattern and practice of the Company, upon information and belief, Elior hired a white male under the age of 40 to replace Ms. Johnson after she was fired.

## COUNT ONE
## (Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964)

93.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

94.     Plaintiff is a woman who was qualified for her position when Defendant fired her.

95.     Defendant discriminated against Plaintiff by marginalizing her in the positions she held and the compensation she was paid compared to her similarly situated male employees whom Defendant treated more favorably.

96.     Plaintiff suffered damages as a result of Defendant's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

97.     Defendant intentionally violated Plaintiff's rights under Title VII with malice or reckless indifference, and, as a result is liable to Plaintiff for punitive damages.

## COUNT TWO
## (Retaliation in Violation of Title VII of the Civil Rights Act of 1964)

98.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

99.     Plaintiff engaged in protected activity on multiple occasions by complaining about the discriminatory treatment she received based on her gender.

100.     Defendant unlawfully retaliated against Plaintiff for her protected complaints by, *inter alia,* unilaterally assigning her a bonus goal that Defendant knew she would not be able to achieve, failing to pay her the full bonus she should have been paid, and ultimately, terminating her employment.

101.     Defendant's alleged reason for terminating Plaintiff's employment was pretextual and baseless.  Defendant fired Plaintiff because she complained of gender discrimination.

102.     Plaintiff suffered damages as a result of Defendant's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

103.     Defendant intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE
## (Discriminatory Termination Based on Age in Violation of the ADEA)

104.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

105.     Plaintiff was over 40 years old and qualified for her position when Defendant fired her.

106.     Defendant marginalized Plaintiff while treating younger similarly situated employees more favorably.

107.     Immediately after firing Plaintiff, Defendant replace her with a male under the age of 40 with less experience than Plaintiff.

108.     Plaintiff suffered damages because of Defendant's unlawful discriminatory actions, including past and future lost wages and benefits and the costs of bringing this action.

109.     Defendant willfully violated Plaintiff's rights under the ADEA and, as a result, is liable for liquidated damages.

## COUNT FOUR
## (Unequal Pay in Violation of The Equal Pay Act)

110.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

111.     At the time she was hired and prior to her termination Plaintiff was performing a common core of tasks associated with her job that were substantially equal to that of her male counterparts.

112.     The conditions where Plaintiff and her male counterparts performed the work were basically the same.

113.     Plaintiff's male counterparts were paid more under these circumstances in violation of the Equal Pay Act. Upon information and belief, her counterparts also received additional benefits.

114.     Plaintiff suffered damages as a result of Defendant's unlawful discriminatory actions, including past and future lost wages and benefits, and the costs of bringing this action.

115.     Defendant willfully violated Plaintiff's rights under the EPA, and as a result, is liable for liquidated damages.

## COUNT FIVE
## Retaliation in Violation of the Equal Pay Act

116.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

117. On multiple occasions as shown above Plaintiff engaged in protected activity by complaining to her supervisors about her unequal pay based on her gender.

118. Defendant unlawfully retaliated against Plaintiff for her protected complaints by, *inter alia,* unilaterally assigning her a bonus goal that Defendant knew she would not be able to achieve, failing to pay her the full bonus she should have been paid, and ultimately, terminating her employment.

119. Defendant's alleged reason for terminating Plaintiff's employment is pretextual and baseless. Defendant fire Plaintiff because she complained about unequal pay and position based on her sex.

120. Plaintiff suffered damages as a result of Defendant's unlawful retaliatory actions, including past and future lost wages and benefits, and the costs of bringing this action.

121. Defendant willfully violated Plaintiff's rights under the EPA and, as a result, Defendant is liable for liquidated damages.

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1. That she be awarded damages for her past and future loss of wages and benefits, plus interest;

2. That she be awarded compensatory damages;

3. That she be awarded punitive damages for Defendant's malice or reckless indifference of Plaintiff's rights in violation of Title VII;

4. That she be awarded liquidated damages for Defendant's willful violations of the ADEA and EPA;

5. That she be awarded her costs and reasonable attorneys' fees incurred in connection with this action;

6. That this case be tried by a jury; and

7. That she have such other and further relief as the Court deems just and proper.

        STRIANESE HUCKERT, LLP

        */S/*

        _____

        T. Jonathan Adams
        N.C. Bar No. 21890
        3501 Monroe Road
        Charlotte, North Carolina  28205
        (704) 966-2106
        Jadams@strilaw.com